IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

KAREN DORRIS,                          )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )        Case No. 3:04-0983
                                       )        District Judge Trauger
CUMMINS ENGINE COMPANY, INC.           )        Magistrate Judge Knowles
GROUP INSURANCE PLAN; LONG TERM        )
DISABILITY PLAN OF CUMMINS ENGINE      )
COMPANY, INC., CUMMINS, INC.;          )
CONNECTICUT GENERAL LIFE               )
INSURANCE COMPANY; and LIFE            )
INSURANCE COMPANY OF NORTH             )
AMERICA;                               )
                                       )
        Defendants.                    )


**MEMORANDUM**

This action arises out of plaintiff Karen Dorris's claim for an award of long-term disability

("LTD") benefits, pursuant to an employee disability income policy ("the Policy"), maintained and

partially self-insured by her former employer, Cummins Engine Company, Inc. ("Cummins").

Currently pending before the court are cross-motions for judgment on the administrative record by

defendants (Docket No. 74) and by plaintiff (Docket No. 77) and  responses thereto (Docket Nos.

79 and 80).

I.      **FINDINGS OF FACT**

        The facts are gleaned from the administrative record, which was filed by defendants on

March 21, 2005 (Docket No. 32 & Attachs.), supplemented by defendants on May 18, 2005 (Docket

No. 39) and on August 15, 2006 (Docket No. 72), and by plaintiff on August 24, 2006 (Docket No.

1

73). [1]

**The Plaintiff**

Karen Dorris worked for Cummins for almost fifteen (15) years. (LINA KD 211). Her position as a customer service representative at Cummins required her, at a minimum, to sit continuously for 5.5 or more hours per day, reach frequently at desk level, and occasionally walk and stand. (LINA KD 249). During 2001, Ms. Dorris began to experience fatigue, extreme pain, headaches, stiffness, and sensitivity to light. (LINA KD 149). Her ability to perform the usual activities of daily living began to decline. (Id.) She was "practically bed- or chair-bound for 2-3 days at a time." (Id.) She had once been very active in community and her stepchildren's activities, but her participation in such activities became dependent on how she felt on a given day. (LINA KD 0211). She described her mind as "foggy" and her memory "a problem." (Id.) She often felt faint, nauseated, and confused. (LINA KD 0212).

Between 2001 and 2003, six physicians of various specialties examined Ms. Dorris and concurred in a diagnosis of fibromyalgia. Dr. Paulo Acosta, a neurologist, diagnosed her with fibromyalgia in January 2002. (LINA KD 1208-10). Dr. Thomas John, a rheumatologist, was consulted on February 5, 2002, and concurred in the diagnosis of fibromyalgia. (LINA KD 131). On March 3, 2002, Dr. Michael Lee, an ENT physician, concluded that Ms. Dorris suffered from fibromyalgia, migraines, and possibly the medications used to treat her conditions. (LINA KD 129). On December 13, 2002, Dr. John Nwofia, a pain medicine specialist, found that Ms. Dorris met all the criteria for fibromyalgia syndrome with myglasisas. (LINA KD 128). On January 15, 2003, Dr.

---

[1]For ease of reference, the court adopts the manner of citation used by the parties in their briefing, and therefore cites herein to the administrative record as "LINA KD."

2

Jimmy Wolfe, a neurologist, found that Ms. Dorris had at least 15 of 18 paired "trigger points" consistent with fibromyalgia. (LINA KD 135-36). On July 7, 2003, Dr. Joseph Ozenne, an internal medicine specialist, stated that Ms. Dorris had "the most severe case of fibromyalgia [he] had ever seen." (LINA KD 577-78).

Ms. Dorris also suffered from a number of concurrent, aggravating conditions documented by her physicians, including migraines, Epstein Barr Virus and cytomegalovirus infections, obstructive sleep apnea, restless leg syndrome, and symptoms associated with connective tissue disease. (LINA KD 577-578, 149, 130).

**The Defendants**

According to defendants, the Policy was issued by Equitable Life Assurance Society of the United States and assumed by Connecticut General Life Insurance Company ("CGLIC") (Docket No. 75 at 1-2); CGLIC was the claims administrator of the Policy during the relevant time period, and CGLIC made all decisions to deny disability benefits to Ms. Dorris (Docket No. 64 at 3); CGLIC would be responsible for paying the first twenty-four (24) months of disability benefits if awarded in this action, and Cummins, Inc. would be responsible for paying the remaining portion of any judgment for disability benefits entered in this action (Id.); and all health care and dental coverage options described in this stipulation are self insured by Cummins, Inc., subject to employee contributions and the other applicable terms and conditions. (Id.)

**The Policy**

3

Cummins maintains a LTD policy for its employees. (Docket No. 1 ¶1). Initially, under plan documents represented by CIGNA Group Insurance ("CIGNA")[2] to be controlling, in order to be "totally" disabled, Ms. Dorris had to prove she was unable to perform "any and every duty pertaining to [her] employment." (LINA KD 150, 227, 852, 928). Under the plan documents which CIGNA now claims are controlling, in order to be "totally" disabled, Ms. Dorris had to prove she was unable to perform "all duties pertaining to [her] employment." (LINA KD 895, 1823). Specifically, the Policy states

> You [the claimant] are "totally disabled" if you are unable during the first two (2) years (which includes six (6) months of salary continuance) of a period of disability to do all duties pertaining to your employment. For the rest of the period of disability you must not be able to do any work for compensation or profit for which you may be reasonably fitted by learning or experience.
>
> You will not be deemed disabled if you do any work for compensation or profit (including self-employment), or during a period in which you are not under the direct care of a doctor. This direct care starts when the doctor examines you.

(LINA KD 895, 1823).

Claimants "must give proof of such disability that will satisfy the Claims Administrator." (LINA KD 1824). The Policy also provides that the monthly benefit will be reduced by what the individual receives from the Social Security Administration and that a claimant "must apply for Social Security disability benefits before [one] can receive full long-term disability payments." (LINA KD 1823).

_____

[2]Many of the documents in the administrative record refer to "CIGNA Group Insurance." According to defendants, CIGNA Group Insurance is not a separate legal entity; the correct CIGNA entity defendant is CGLIC. (Docket No. 75 at 2 n.2). Indeed, CIGNA Group Insurance is not a defendant in this action. Therefore, CIGNA and CGLIC are used interchangeably throughout this opinion to refer to the same entity--the entity defendants represent made all decisions regarding Ms. Dorris's LTD benefits claim.

4

**Ms. Dorris's Disability Claim Filed**

Ms. Dorris received short term disability benefits in the amount of 100% of her salary between November 3, 2001 and February 3, 2002, and in the amount of 75% of her salary between February 4, 2002 through May 3, 2002. (LINA KD 1204).

Ms. Dorris submitted her application for LTD benefits under the Policy on March 28, 2002, claiming she became disabled due to intense pain, fibromyalgia, fatigue, and frequent headaches. (LINA KD 1202-13). According to her application, her sickness began in January 2001, she last worked on November 2, 2001, and she was totally disabled as of December 13, 2001. (LINA KD 1202-04).

In her application, Ms. Dorris identified four attending physicians: Drs. Acosta, Ozenne, John, and Salcedo. (LINA KD 1202). Ms. Dorris also submitted an "Attending Physician's Statement of Disability" dated April 18, 2002, completed by Dr. Acosta. (LINA KD 1208-10). In that Statement, Dr. Acosta recounted that he first treated Ms. Dorris on January 28, 2002. (Id.) He diagnosed her with having obstructive sleep apnea and fibromyalgia, described Ms. Dorris's subjective symptoms as "chronic fatigue and sleepiness," and noted objective findings of "abnormal sleep tests." (LINA KD 1210). He indicated that she could balance for greater than five (5) hours; reach, walk, sit, and stand for up to 2.5 hours; and climb, stoop, kneel, crouch, and crawl for zero (0) hours. (LINA KD 1208). He also indicated she could lift and carry ten (10) pounds, and she could push and pull ten (10) to twenty (20) pounds. (Id.) Based on these findings, Dr. Acosta concluded that Ms. Dorris's disability was "total" with regard to her own occupation and any occupation, that she was a suitable candidate for further physical rehabilitation service, that her present job could not be modified to allow for handling her impairments, and that she was not a

suitable candidate for vocational rehabilitation. (Id.)

On May 1, 2002, CIGNA notified Ms. Dorris via letter that her application had been received. (LINA KD 1199-1201). The letter requested that Ms. Dorris provide an authorization for the release of medical records. (Id.) On May 1, 2002, CIGNA requested medical records for Ms. Dorris from Drs. John, Salcedo, and Acosta via facsimile marked "Urgent" and "Please Reply." (LINA KD 1195-98, 1191-94, 1187-90). CIGNA only received medical records from Dr. Acosta. (LINA KD 1143). In those records, Dr. Acosta reiterated that Ms. Dorris's diagnoses were fibromyalgia (primary) and obstructive sleep apnea (secondary). (LINA KD 0425). He noted that her current subjective complaints were sleep disturbance, headaches, swelling in extremities, diffuse musculoskeletal pain, facial pain, fatigue, morning stiffness, numbness/tingling, "creepy crawly" sensation in legs, hypersensitivity to light, sound, and/or touch, dysequilibrium, chest discomfort, anxiety, intermittent confusion, and leg cramps. (LINA KD 0425, 0439). Dr. Acosta's current clinical findings were "severe aching pain in both extremities, bilateral occipul at muscle insertions, trapezius (bilateral) at upper borden, 2nd nb bilateral at costochrondal junction, bilateral knee (medially), low cervical (C5-C7), supraspinatus bilateral, gluteal bilateral, bilateral lateral epicondyle, greater trochanter bilateral, and restless legs syndrome." (LINA AR 0439). He noted that he had utilized the following treatment options in Ms. Dorris's care: physical therapy, antidepressants, NSAID's, home exercise, muscle relaxants, analgesics, relaxation therapy, and neurontin. (Id.)

In his "Physical Ability Assessment" ("PAA") of Ms. Dorris dated May 10, 2002, Dr. Acosta checked boxes indicating that Ms. Dorris's "Current Level of Functionality" was sedentary, and that

6

she could perform light work infrequently. (LINA KD 0440). More specifically, based on his clinical evaluation of Ms. Dorris, he identified her functional capabilities as: frequently (2.5 to 5.5 hours) being able to sit; and occasionally (< 2.5 hours) being able to: lift and carry ten (10) pounds, push and pull fifteen (15) pounds, stand, walk, climb, stoop, kneel, crouch, crawl, reach (overhead, desk level, below waist), and grasp. (LINA KD 0440-41). With the PAA, Dr. Acosta submitted Ms. Dorris's medical records documenting clinical tests including an MRI of the head that was negative and a nocturnal polysomnography that revealed mild obstructive sleep apnea. (LINA KD 0430).

On May 8, 2002, Cummins completed a job requirements questionnaire for CIGNA, upon its request, regarding Ms. Dorris's job. (LINA KD 0443-45). The supervisor who completed the form for Cummins indicated that Ms. Dorris's job as a customer service representative required, in an eight (8)-hour workday, the following: continuous (5.5+ hours) seeing, hearing, and sitting; frequent (2.5 to 5.5 hours) reaching at desk level; and occasional (< 2.5 hours) standing, walking, and stooping. (LINA KD 0443-44). The supervisor further indicated that Ms. Dorris's position required her to do the following: accept responsibility for control, direction, or planning of an activity; perform repetitive or continuous activity according to set procedures; influence people in their opinions, attitudes, or judgments about ideas or things; perform a variety of duties, often from one task to another without loss of efficiency or composure; interpret feelings, ideas, or facts in terms of personal viewpoint; be without face-to-face contact for extended periods of time; perform with demands of precise attainment of set limits, tolerances, or standards; perform without room for independent action or judgment; deal with people beyond giving and receiving instruction such as working as a member of a team or committee; and make generalizations, judgments, or decisions

7

based on subjective or objective criteria such as with the five senses or with factual data. (LINA KD 0445).

**Ms. Dorris's Claim for LTD Benefits Is Denied**

CIGNA case manager William Smith issued an initial denial on June 3, 2002, advising Ms. Dorris that he had reviewed the information provided by Cummins as to Ms. Dorris's job requirements as well as the medical assessment and records submitted by Dr. Acosta. He noted that her job as a customer service representative was sedentary, which required Ms. Dorris to sit, see, and hear continuously, reach at desk level frequently, and stand, walk, and stoop occasionally. (LINA KD 0229). In conveying CIGNA's benefits decision to Ms. Dorris by letter, Mr. Smith wrote:

> [a]lthough the medical records received document numerous complaints (i.e., fatigue, sleepiness, pain) and test results show that you do have mild obstructive sleep apnea, no clinical evidence has been provided showing the presence of severe exam findings/observations that would significantly impair your functionality thereby preventing you from performing your job as a Customer Service Representative as of your last day worked on November 2, 2001, and throughout the Benefit Waiting Period of November 3, 2001, through May 3, 2002, and as of the Benefit Start Date of May 4, 2002.
>
> We realize that you may experience symptoms such as fatigue, pain and headaches. Rather what we are saying is despite your subjective complaints, the medical records do not show clinical evidence that would prevent you from performing your job. Therefore, your Long Term Disability and Waiver of Premium claims have been denied and no benefits are payable.

(LINA KD 0227-30). He advised Ms. Dorris that she had the right to appeal the decision. (LINA KD 0230). To assist Ms. Dorris in formulating her appeal, Mr. Smith gave examples of material that could assist her in her appeal, such as a personal letter explaining why she could not perform her job or any job for which she may be qualified, a copy of an independent medical examination, and a

8

complete copy of her medical records from November 2001 to the present. (LINA KD 0230).

**Ms. Dorris Seeks Social Security Disability Benefits**

On May 10, 2002, CIGNA notified Ms. Dorris by letter that her LTD policy required her to apply for Social Security Disability Insurance ("SSDI") and that "[i]t was not necessary" for her to do so "on her own" because CIGNA would assist her in the process through Advantage 2000 Consultants, Inc. ("A2K"), a firm specializing in Social Security Disability claims. (LINA KD 0797). CIGNA informed Ms. Dorris that the services of A2K were free of charge and voluntary, and CIGNA could not guarantee that Ms. Dorris's claim would be approved. (LINA KD 0798).

On June 10, 2002, Ms. Dorris filed her claim for Social Security disability benefits. (LINA KD 1135-36). On July 22, 2002, the Social Security Administration ("SSA"), having reviewed records from Drs. Acosta, Salcedo and John, denied Ms. Dorris's claim for disability benefits, stating on the record that "although you do have fibromyalgia, lupus and leg pain, the evidence shows that you will be able to stand, move about and use your arms, hands and legs in a satisfactory manner." (LINA KD 1130). The SSA concluded that Ms. Dorris's condition was "not severe enough to keep [her] from working." (Id.) Ms. Dorris contends that A2K unilaterally terminated her Social Security representation when CIGNA denied her claim and lost interest in a Social Security offset. (Docket No. 78 at 6).

**Ms. Dorris Appeals the Denial of Her Claim**

On July 24, 2002, Ms. Dorris appealed CIGNA's decision for the first time. (LINA KD 0724-25). In support of her appeal, she submitted additional records, including records of visits with Drs. John, Salcedo, and Ozenne. Drs. Ozenne and Salcedo were both part of the Tennessee Christian Medical Group, from whom Ms. Dorris submitted medical records documenting treatment

9

between January 2001 and July 2002. (LINA KD 0700-20). Those records reveal that Ms. Dorris voiced complaints about fatigue, chills, tremors, migraine headaches, pain, and depression manifested in "crying spells." (Id.) For these ailments, Ms. Dorris was prescribed a number of drugs, including Paxil, Atenolol, Zanaflex, Imitrex, Neurontin, HCTZ, and Premphase. (LINA KD 0716).

Ms. Dorris also submitted records from Dr. John, who concurred in the diagnosis of fibromyalgia, though he thought she may also suffer from low grade connective tissue disease. (LINA 0131). In February 2002, he observed that Ms. Dorris's condition seemed to be improving with the use of Plaquenil, and that he was going to "bump it up to two" and consider reducing it back to one when he saw Ms. Dorris for a follow-up in four months. (LINA KD 0736). In their follow-up visit, Dr. John observed a "little bit of inflammation," recommended continued physical therapy and Plaquenil use and stated that he would "see her back in a year just to see how things are going." (LINA KD 0734). He gave her the name of the book, "Making Sense of Fibromyalgia" and "had a long talk with her" about the need for her to seek therapy and exercise. (LINA KD 0131).

On August 7, 2002, CIGNA informed Ms. Dorris that it had received her appeal, which was being forwarded to the Disability Appeals Team. (LINA KD 0670). On October 23, 2002, Kim Rudeen, CIGNA Appeals Claim Examiner, informed Ms. Dorris that her appeal was being denied. (LINA KD 0657-58). Citing and applying the "any and every duty pertaining to your employment" policy language, Ms. Rudeen found that "the medical information did not support the claim that [Dorris was] unable to continue performing [her] sedentary employment as a Customer Service Representative." (LINA KD 0658). She wrote:

> In review of the additional medical information received on appeal
> we note that we have been provided with medical records dating back

> to January 2001. Our records indicate that you last worked 11/3/01. In review of this information we note that there is not evidence of a change in your condition that would have caused you to cease work, nor have we received restrictions and limitations from your treating physicians that reveal you were incapable of sedentary work activity when you ceased work.
>
> Because we have not received information to support that you were Disabled from your employment through the Qualifying Period we must affirm our previous decision to deny your claim.

(LINA KD 0658). Ms. Rudeen told Ms. Dorris in the letter that she had the right to pursue legal action for benefits under ERISA Section 502(a). (Id.)

**Cummins Reviews CIGNA's Denial of Ms. Dorris's Appeal**

In a letter to Ms. Dorris dated April 29, 2003, Cummins informed Ms. Dorris that, upon her request, it had reviewed her LTD claim, including the materials she had submitted to Cummins as well as the claim file obtained by CIGNA with Ms. Dorris's permission. (LINA KD 0575). Cummins stated: "We need to make clear that the final determination of disability and entitlement to benefits in this case rests with CIGNA for this insured long term disability benefit [sic]. As the employer, Cummins reviewed the documentation to be sure CIGNA fulfilled its obligation under our plan." (Id.)

After conducting its own review, Cummins concluded that (1) CIGNA had applied the "correct plan design terms" to her claim; (2) CIGNA had reached a decision that was "not unreasonable given the medical and other documentation" in her file; and (3) that CIGNA had given Ms. Dorris all appeals required by the applicable policy. (Id.) Cummins noted, however, that it was "concerned" that she "may not have clearly understood the specific reasons for CIGNA's denial or what information could support an approval." (Id.) Thus, Cummins requested to CIGNA that Ms.

11

Dorris be allowed to appeal again, and its request was granted. (Id.) Margaret Gray-Mayer, writing for Cummins, explained:

> We asked CIGNA to help us understand exactly what information was lacking. CIGNA accepts that Mrs. Dorris has unpleasant symptoms and she had Fibromyalgia. But they were looking for medical evidence that these symptoms and this condition rendered her unable to perform her job when she stopped work on 11/1/2001 and during all the months since then.

(Id.) Ms. Gray-Mayer gave Ms. Dorris three specific examples of what types of evidence would be helpful to her appeal. (LINA KD 0575-76).

**Ms. Dorris's Second Appeal to CIGNA is Denied**

On August 12, 2003, by letter CIGNA informed Ms. Dorris that it had received her second appeal. (LINA KD 0570). The letter contained specific instructions and information regarding the substance and timing of her appeal. (Id.) On September 10, 2003, CIGNA informed Ms. Dorris by letter that it would be requesting a peer review of her claim from a board certified physician who would most likely attempt to contact her doctors. (LINA KD 0567). The letter encouraged her to enlist her doctors' cooperation in this matter. (Id.) In support of her second appeal, Ms. Dorris submitted additional medical documentation, including documentation regarding her condition in 2002 and 2003.

On September 10, 2003, Dr. Kenneth Graulich, a board certified neurologist, completed a peer review of Ms. Dorris's file. (LINA KD 0559-64). He reviewed the records of Tennessee Christian Medical Group, Drs. John, Adams, Acosta, Lee, Nwofia, Wolfe, as well as a letter from Dr. Ozenne. (LINA KD 0559-62). Dr. Graulich also had phone conversations with Drs. Ozenne and Acosta. (LINA KD 0562). His impressions, based on his review of the submitted medical records and conversations with Drs. Ozenne and Acosta, were of fibromyalgia syndrome, mild obstructive

12

sleep apnea syndrome, and anxiety and depression (questionably situational). (LINA KD 0562-63).

He did not believe there was definite evidence for an undifferentiated connective tissue disease.

(LINA KD 0563). Ultimately, he opined that

> [t]he medical documentation does not support the patient's inability
> to work as a customer service representative on a full-time sedentary
> basis during the time period of 11/3/01 to 5/3/02 and from 5/4/02
> through the present. Fibromyalgia syndrome is a controversial
> diagnosis. There is no known pathological substrate. All of the
> symptoms and signs are self-reported in type.
> . . .
> There is no definite evidence of a change in progression of the
> patient's condition leading up to and directly prior to her last day of
> work in November of 2001 except for an increase in self-reported
> symptoms and a finding of tender points (which would be self-
> reported signs on examination). In my opinion this would not be
> sufficient to warrant full impairment from sedentary work.

(LINA KD 0563-64).

On October 17, 2003, CIGNA denied Ms. Dorris's appeal for a second time. Pattie Holt,

CIGNA Appeals Claims Examiner, explained to Ms. Dorris that her claim was being denied for the

reasons stated in previous denial letters and because CIGNA has "still received no information

sufficient to change [its] previous decision." (LINA KD 0546). Ms. Holt also referenced the

findings of Dr. Graulich who concluded that all of Ms. Dorris's "symptoms and signs are self

reported, and [CGLIC has] no medical evidence to support that [Dorris's] condition is severe enough

to prevent [Dorris] from doing sedentary work." (LINA KD 0546). Holt informed Ms. Dorris that

she had exhausted all of her administrative remedies under the policy, and that she had a right to

bring a legal action under ERISA Section 502(a). (LINA KD 0547).

**Ms. Dorris Is Awarded Social Security Disability Benefits**

On September 14, 2004, Ms. Dorris, through her attorney, notified CIGNA that on August

25, 2004, Ms. Dorris received a "fully favorable" award of disability benefits by the SSA. (LINA KD 0054-55). The SSA had determined that Ms. Dorris was disabled as a result of fibromyalgia and depressive disorder. (LINA KD 0063). Ms. Dorris asked CIGNA to review and consider the Social Security award with regard to her claim for disability benefits. (LINA KD 0055).

On September 24, 2004, CIGNA advised Ms. Dorris's attorney that CIGNA had already reviewed Ms. Dorris's claim as a mandatory appeal, and again as a voluntary appeal, and that Ms. Dorris had "exhausted all her appeal rights" such that no further appeals would be considered. (LINA KD 0050).

**Ms. Dorris Files Suit**

On October 29, 2004, Ms. Dorris filed this instant action. (Docket No. 1). On October 11, 2005, Ms. Dorris filed a motion for limited discovery and for inclusion of the SSA award as part of the administrative record. (Docket No. 47). On November 8, 2005, this court ordered the claim to be remanded to CIGNA for reconsideration in light of the SSA award. (Docket No. 52). Following the court's Order, the defendants moved for relief under Rule 60(b), asking the court to reconsider its decision regarding the remand. (Docket Nos. 53,54). On December 21, 2005, the court denied the defendants' Rule 60(b) motion and affirmed its ruling that remand was appropriate to allow the defendants to consider the SSDI decision. (Docket No. 58).

On May 26, 2006, plaintiff moved to reinstate this action, explaining that over five months had passed since the court's Order, but the defendants had not communicated any decision regarding the consideration of the Social Security disability benefits. (Docket No. 59).

Pursuant to the court's Order of November 8, 2005, CIGNA had Ms. Dorris's entire claims file, including the SSA award, reviewed by Dr. Paul D. Seiferth, Medical Director for Life Insurance

14

Company of North America. (LINA KD 1871). Dr. Seiferth found that "inconsistent among the medical providers is establishment of an objective capacity limitation or functional impairment throughout the medical records to support any restrictions . . . ." (LINA KD 1871). He concluded that "[m]edical records on a whole including the review of the Social Security Disability determination do not support the establishment of an impairment of functional capacity to support the restrictions and limitations of less than sedentary as so noted." (LINA KD 1871).

On May 31, 2006, just days after plaintiff's motion to reinstate was filed, CIGNA Appeals Claims Manager James Sharp issued a letter informing Ms. Dorris that CIGNA had reviewed her entire claims file, including the SSA award, in accordance with the Court's Order and was upholding its previous determination that Ms. Dorris was not entitled to benefits. (LINA KD 1866-68). Mr. Sharp explained that Ms. Dorris's position was sedentary, and the restrictions and limitations suggested by the medical evidence were consistent with her ability to perform sedentary work. Mr. Sharp further stated that, although Dr. Seiferth had found the diagnosis of fibromyalgia to be "well established in the record," he had also found that "objective evidence of the impairment component of the presence of fibromyalgia was not indicated throughout the medical record reviewed." (LINA KD 1867). Addressing the Court's instruction to consider the SSA award, Mr. Sharp informed Ms. Dorris that Dr. Seiferth had concluded that the medical records reviewed by the SSA did not support a finding of disability as defined in the Policy. (LINA KD 1868). He cited to policy language requiring Ms. Dorris to be unable to do "all duties pertaining to" her employment in order to qualify for total disability. (LINA KD 1867). Mr. Sharp also pointed out that the standards for determining disability under Ms. Dorris's policy might be different than the standards used for determining disability by the SSA. (LINA KD 1868). Because there were no "hospitalization record, test

15

results, therapy notes, lab results, or neuropsychological testing to document a severity of Mrs. Dorris's conditions from November 3, 2001 to present to preclude her from performing her regular employment," Mr. Sharp stated that CIGNA could not find support for Ms. Dorris's claim of disability. (Id.)

Ms. Dorris contends that CIGNA's determination was erroneous, and asks the court to reverse CIGNA's decision and award her LTD benefits in accordance with the Policy.

## II.   CONCLUSIONS OF LAW

### A.   Standard of Review

The Supreme Court instructs that a denial of benefits challenged under ERISA "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). The language of the plan determines whether the court must apply the arbitrary and capricious standard of review or whether the court must review the determination de novo. If the language of the plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe plan terms, the highly deferential arbitrary and capricious standard applies. Id. "While 'magic words' are unnecessary to vest discretion in the plan administrator and trigger the arbitrary and capricious standard of review, this circuit has consistently required that a plan contain 'a clear grant of discretion [to the administrator] to determine benefits or interpret the plan.'" Perez v. Aetna Life Ins.

Co., 150 F.3d 550, 555 (6th Cir. 1998)(en banc)(quoting Wulf v. Quantum Chem. Corp., 26 F.3d

16

1368, 1373 (6th Cir. 1994)(emphasis in original)).

Here, defendants contend that CGLIC's decision to deny benefits can only be reversed if it was arbitrary and capricious because the governing plan gives CGLIC absolute discretion to decide issues of this nature and to interpret the plan language. Defendants cite to the following language in the plan document found at LINA KD 1786-1863 in support of their contention: "You must give proof of such disability that will satisfy the Claims Administrator." (LINA KD 1824).

Plaintiff counters by arguing that a de novo, rather than an arbitrary and capricious standard of review, applies to CGLIC's decision, and that the decision was contrary to the terms of the Policy. According to plaintiff, the de novo standard applies because (1) defendants have relied upon three different plan documents which they claimed at different times govern Ms. Dorris's claim, and only the most recently produced plan document arguably grants discretion to CIGNA; and (2) defendants have represented at different times that different entities operated as the claims administrator. As such, plaintiff posits there was no "clear" grant of discretion to CGLIC triggering the arbitrary and capricious standard of review.

Plaintiff points out that on November 6, 2003, Linda Weisbord, a regional claims manager for CIGNA, sent a plan document with a cover letter stating: "Please find the attached complete booklet which was effective 1-1-92. I believe this is the complete information you requested." (LINA KD 70-108). After Ms. Dorris retained counsel, her counsel wrote to CIGNA confirming that this was the correct governing document. Counsel stated: "I asked because documents in the file seem to have conflicting language on certain points." (LINA KD 880). The plan document previously produced by CIGNA stated: "You must give proof of such disability that will satisfy Fleetguard, Inc. or Separation Technologies, Inc." (LINA KD 84). The document does not grant

17

discretionary authority to CIGNA or any other defendant.

Similarly, on October 27, 2005, defendants represented to the court that another document was "the policy at issue," and argued that it contradicted the claims made by Ms. Dorris. (Docket No. 51 at 2-3). This document, entitled "Fleetguard Insurance Benefits," (LINA KD 848) states that LTD benefits will be paid if "'due proof' of the disability is given to 'the Equitable.'" (LINA KD 852-53). This document neither grants discretion nor confers any other rights on the defendants in this case.

Defendants allege that they produced the plan document on which they now rely sometime in October 2005, approximately a year after this lawsuit began and several years after CIGNA's last denial during the claims process.[3] (Docket No. 78 at 8). Defendants have now stipulated that it is the correct plan document governing Ms. Dorris's claim. The relevant plan language therein provides that:

> You must give proof of such disability that will satisfy the Claims
> Administrator.

(LINA KD 1824). Notwithstanding plaintiff's arguments to the contrary (Docket No. 78 at 8), the court finds that, standing alone, this language is sufficiently clear and express in granting discretionary authority to the claims administrator to interpret the plan and to assess claims for plan benefits. Courts have held that plan language such as this, requiring that "satisfactory" proof or evidence be provided to the insurer, is sufficiently clear to vest the insurer with discretion, and therefore the insurer's decision should be reviewed under the arbitrary and capricious standard of

---

[3]On August 3, 2006, defendants stipulated that this third plan document is the Policy governing Ms. Dorris's claim, and stated that they provided a copy of that Policy to Ms. Dorris "in October 2005." (Docket No. 71, Stip. 3). Oddly, the Policy was not made a part of the administrative record until defendants filed it with the court on August 15, 2006. (Docket No. 72).

18

review.  See, e.g., Perez, 150 F.3d at 555-57; Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 380-81 (6th Cir. 1996)(applying arbitrary and capricious standard of review where plan provided that claimant must submit "satisfactory proof of Total Disability" to insurer); Miller v. Metro. Life Ins. Co., 925 F.2d 979, 983 (6th Cir. 1991)(applying arbitrary and capricious standard of review where plan provided that disability would be determined "on the basis of medical evidence satisfactory to the insurer.").

However, the court's inquiry does not end here.  Defendants did not produce this document until October 2005.  Ms. Dorris filed her claim for benefits in March 2002.  In the intervening years, defendants relied upon different plan documents which did not clearly vest discretionary authority to CGLIC, the entity that the defendants now say made the decisions to deny benefits to Ms. Dorris. In addition, just as defendants have relied on different plan documents at different times in evaluating Ms. Dorris's claim, defendants have identified different entities as the claims administrator over the years since the inception of Ms. Dorris's claim.[4]

For these reasons, the court agrees with plaintiff that CGLIC has not clearly established that it had discretionary authority to determine eligibility sufficient to trigger the "arbitrary and capricious" standard of review.   Cf.  Sanford v. Harvard Indus., Inc., 262 F.3d 590, 595 (6th Cir. 2001)(the de novo standard of review applies when an unauthorized body makes the decision denying the benefits claim, regardless of the degree of discretionary authority provided in the plan); Mathis v. Mahle, Inc., 165 F. App'x 457, 459 (6th Cir. 2006)("Even where a plan vests a party with

_____

[4]Following remand, CIGNA sent a denial letter to Ms. Dorris stating that AXA Equitable Life Insurance was the claims administrator and that it was AXA who reviewed her claim.  (LINA KD 1867).  However, defendants later stipulated that CGLIC made all decisions with regard to the denial of the claim.  (Docket No. 64, Stip. 5).

19

discretion, however, this court conducts de novo review of claims determinations where a party other

than the one authorized by the plan in fact renders the decision.")  Accordingly, the court finds that

the de novo standard of review applies to defendant CGLIC's denial of Ms. Dorris's LTD benefits.[5]

**B.      Application of De Novo Standard of Review**

Having established that the  appropriate standard of review is de novo, the court will decide

whether CGLIC's determination that Ms. Dorris was not totally disabled was correct.  Ragsdale v.

Unum Life Ins. Co. of Am., 999 F. Supp. 1016, 1024 (N.D. Ohio 1998).  "De novo review means

a review 'without deference to the decision or any presumption of correctness, based on the record

before the administrator.'"  Id.   (quoting Perry v. Simplicity Eng'g, 900 F.2d 963, 966 (6th Cir.

1990)); Lake v. Metro. Life Ins. Co., 73 F.3d 1372, (6th Cir. 1996)(on de novo review, the court

interprets the terms of the plan without deferring to either party's interpretation).   "When a court

reviews a decision de novo, it simply decides whether or not it agrees with the decision under

_____

[5]Even if the court were to find that the arbitrary and capricious standard of review applies, heightened scrutiny would be applied to CGLIC's review process because a conflict of interest exists.  Although the existence of a conflict of interest does not change the standard of review under which the court evaluates a plaintiff's claim, it is a factor for the court to consider in determining whether there has been an abuse of discretion.  Davis v. Ky. Fin. Cos. Retirement Plan, 887 F.2d 689, 694 (6th Cir. 1989); see also Firestone, 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187, Comment d (1959)); see also Univ. Hospitals, 202 F.3d at 847.

Here, because CGLIC made all decisions regarding Ms. Dorris's claim and would be responsible for funding the first two years of any disability benefits paid under the plan, it incurs a direct expense as a result of the allowance of benefits, and it benefits directly from the denial or discontinuation of benefits.  See  Killian Healthsource Provident Adm'rs, Inc., 152 F.3d 514, 521 (6th Cir. 1998); see also Miller v. Metro. Life Ins. Co., 925 F.2d 979, 984 (6th Cir. 1991) ("Because an insurance company pays out to beneficiaries from its own assets... its fiduciary role [as the decision-maker for benefits] lies in perpetual conflict with its profit-making role as a business, and the conflict of interest is substantial.").

review." <u>Perry</u>, 900 F.2d at 966.   The court's primary goal is to give effect to the intent of the parties as expressed by the language of the ERISA plan. <u>Lake</u>, 73 F.3d at 1372.  "When conducting a <u>de novo</u> review, the district court must take a 'fresh look' at the administrative record but may not consider new evidence or look beyond the record that was before the plan administrator." <u>Wilkins v. Baptist Healthcare Sys., Inc.</u>, 150 F.3d 609, 616 (6th Cir. 1998)(citations omitted) (emphasis in original).

The court must determine whether Ms. Dorris has submitted proof that she is totally disabled due to sickness or injury, and that for the period of her disability, she has been under the direct care of a doctor and has not performed any work for compensation or profit.  Having carefully reviewed the administrative record and the parties' briefs submitted in support of their cross-motions for judgment on the administrative record,  the court finds that under the terms of the plan document which CGLIC says is controlling, Ms. Dorris is totally disabled.  The evidence in the record supports a diagnosis of fibromyalgia and functional limitations incompatible with Ms. Dorris's former position at Cummins as a customer service representative.  Therefore, the court cannot uphold CGLIC's decision to deny an award of LTD benefits to Ms. Dorris.

**The Policy Language Used by CGLIC to Initially Deny Ms. Dorris's Claim Was More Stringent than the Language CGLIC Now Identifies as the Correct Plan Language**

CIGNA applied different definitions of disability throughout the claims process.  Under the plan documents identified by defendants as the "complete booklet" in November of 2003, and represented by CIGNA in October of 2005 to be controlling, a claimant was "totally disabled" during the first two years if she could not perform "all duties pertaining to [her] employment." (LINA KD 895, 1823).  Ms. Dorris met this standard, as Dr. Acosta opined that she was unable to reach at desk level for 2.5 to 5.5 hours, as well as sit for over 5 hours  (LINA KD 0440-41), both

21

requirements of her former position at Cummins (LINA KD 0443-44).

However, during the claims process, CIGNA repeatedly represented that, for the first two years of disability, a "totally disabled" claimant must prove that she is unable to "perform any and every duty pertaining to [her] employment." (LINA KD 227, 150, 928). The "any and every duty" standard is more difficult to overcome to the extent that it can be interpreted to mean that an employee must be unable to do every single duty of a job. Cf. McClure v. Life Ins. Co. of North Am., 84 F.3d 1129, 1134 (9th Cir. 1996)(discussing that the word "every" in insurance policy is ambiguous, and has been construed to mean "all," "each," or "any one"). This arguably higher standard is one that Ms. Dorris could not meet because Dr. Acosta had opined that she was capable of performing some of the duties of her job, such as continuously seeing and hearing and occasionally standing, walking, and stooping. (LINA KD 0440-41, 0443-44). Indeed, CIGNA denied Ms. Dorris's claim applying this standard several times. (LINA KD 227, 150, 658, 928).

Even though it appears that CIGNA ultimately applied the less stringent standard contained in the Policy produced in October 2005, the fact the CIGNA used the more strict standard to initially deny her claim for benefits and then continually "moved the ball" as to which policy language governed her claim casts doubt on the reasonableness of CIGNA's decision and raises the possibility that its conflict of interest played a role in its benefits decision.

**Ms. Dorris Submitted Persuasive Evidence that She Has Fibromyalgia**

Dr. Acosta, one of Ms. Dorris's long-time treating physicians, diagnosed her with fibromyalgia in January 2002. (LINA KD 1208-10). He reiterated his diagnosis in May 2002 at the

request of CIGNA. (LINA KD 1143). He described Ms. Dorris's subjective complaints, his clinical

observations, and his methods of treatment thus far. (LINA KD 0425, 0439).

Dr. Ozenne, an internal medicine specialist and another of Ms. Dorris's long-time treating physicians, stated that she had "the most severe case of fibromyalgia [he] had ever seen." (LINA KD 577-78). Dr. Nwofia, a pain medicine specialist, who personally examined Ms. Dorris on December 13, 2002, found that Ms. Dorris met all the criteria for fibromyalgia syndrome with myglasisas. (LINA KD 128). Dr. Lee, an ENT physician, saw Ms. Dorris on March 3, 2002, and concluded that she suffered from fibromyalgia, migraines, and possibly the medications used to treat her conditions. (LINA KD 129). Dr. Wolfe, a second neurologist, examined her on January 15, 2003, and found that Ms. Dorris had at least 15 of 18 paired "trigger points" consistent with fibromyalgia. (LINA KD 135-36). Ms. Dorris consulted Dr. John, a rheumatologist, on February 5, 2002, and he concurred in the diagnosis of fibromyalgia. He noted that she may also have low grade connective tissue disease. (LINA KD 131). Even CIGNA's reviewing physician, Dr. Graulich, found that Ms. Dorris has fibromyalgia. (LINA KD 555-56).

**Ms. Dorris Submitted Persuasive Evidence that, Because of the Limitations Caused by Her Fibromyalgia, She Cannot Perform All of the Duties of Her Employment**

Ms. Dorris's policy is a "regular occupation" policy, meaning that, if she cannot perform the duties of her position as a customer service representative, she is in fact disabled, even if she might be able to perform other sedentary work. Specifically, the Policy states that she meets this requirement if she cannot perform all of the duties of her employment. (LINA KD 1823).

Ms. Dorris's employer stated in CIGNA's "Job Requirements" form that she must be capable of sitting for 5.5 hours or more a day (referred to as "continuously") and reaching at desk level for 2.5 or more hours a day (or "frequently"). (LINA KD 249-51). Relying on his "clinical observations," Dr. Acosta stated in his PAA that Ms. Dorris was physically incapable of sitting for

23

the required 5.5 hours a day or from reaching at desk level for the required 2.5 hours a day.  (LINA KD 247-48).  He checked boxes labeled "sedentary work" and "light work" and wrote "infrequent" next to the latter.  (LINA KD 246).

Based on the requirements provided by the employer, Dr. Acosta's PAA clearly established that Ms. Dorris could not perform <u>all</u> of the duties of her job.  Yet, in its initial denial of Ms. Dorris's claim for benefits, CIGNA stated that "no clinical evidence has been provided showing the presence of severe exam findings/observations that would significantly impair your functionality." (LINA KD 229).  Citing to the PAA as a reason for denying Ms. Dorris's claim, CIGNA stated that Dr. Acosta had determined that she was able to function in a sedentary capacity, and that the job description provided by her employer revealed her job was sedentary.

First, Dr. Acosta's PAA, which was based on his clinical observations and personal treatment of Ms. Dorris, provided clinical evidence of Ms. Dorris's functional impairments.  Second, relying on Dr. Acosta's check beside the box for sedentary work ignores the fact that in the same form, completed on the same day, Dr. Acosta specifically documented that Ms. Dorris was unable to sit for five and half (5.5) hours  per day and unable to reach at desk level for two and a half (2.5) hours per day,  (LINA KD 0440-41), both of which were requirements of her former position at Cummins (LINA KD 0443-44).  <u>See</u> <u>Glenn v. Metlife</u>, 2006 WL 2519293, at *3 (6th Cir. Sept. 1, 2006)(where claimant's cardiologist stated multiple times that he did not believe claimant should return to work, but checked a "yes" box on one of the administrator's forms regarding the claimant's ability to do sedentary work, court found it unreasonable for administrator to offer no explanation as to why it seized upon certain aspects of the reports from the claimant's treating cardiologist but failed to give weight to his other reports where he specifically stated the claimant was totally disabled).

24

Dr. Acosta continued to treat Ms. Dorris and repeatedly opined that her condition rendered her totally disabled from her job or any office job and from the usual activities of daily living. (LINA KD 149 (1/14/03), 593 (3/17/03)).   Likewise, Dr. Ozenne, who initially saw Ms. Dorris in September of 2001, said that Ms. Dorris's severe case of fibromyalgia rendered her totally incapacitated and unable to work.  (LINA KD 577-58).  After seeing her on December 13, 2002, Dr. John Nwofia said she functionally was unable to do much more than self-care.  (LINA KD 128). Finally, physical therapist Marcus Franco documented that during his treatment of Ms. Dorris in 2002, she was unable to perform even sedentary work due to severe cervicothoracic and upper extremity pain, poor endurance, and generalized weakness.  (LINA KD 579).

While it is true that Dr. John noted in February of 2002 that Ms. Dorris's condition seemed to be improving in response to the prescription medication Plaquenil (LINA KD 0736), none of Dr. John's evaluations of Ms. Dorris specifically addressed her ability to perform the duties of her former  job.  Further, the fact that a patient's symptoms improve during treatment does not necessarily mean the patient is able to work, as noted by the court in Green v. Prudential Ins. Co. of Am., 383 F. Supp.2d 980 (M.D. Tenn. 2005)(Nixon, J.):

> Even if Green's symptoms had improved, this does not mean that Green was able to work.  Prudential points out that LaGrone stated in 2000 that Green's symptoms had improved.  The records indeed reflect that LaGrone's [sic] noted, "[Green] is clearly better."  Even so, Prudential's argument fails because even though LaGrone expressed that there was improvement, LaGrone never made any recommendations as to Green's ability to perform the material and substantial duties of her occupation or any occupation for which she is reasonably fitted.  As such, it [is] not reasonable to interpret LaGrone's statement about improvements to mean that Green did not suffer from a disability within the meaning of the plan.

Id. at 992.  Indeed, on July 7, 2003, Dr. Ozenne, the physician who conducted the majority of the

25

Tennessee Christian Medical Group evaluations, stated that, "[e]ven though patient has a sedentary position, she has been totally incapacitated and unable to work since 11/01/01. Therefore, I strongly feel Mrs. Dorris qualifies for disability." (LINA KD 0578).

Even after receiving the above medical information, in a subsequent denial letter, CIGNA told Ms. Dorris: "Your claim was denied on June 3, 2002 as your doctor [i.e. Dr. Acosta] gave limitations that should allow you to perform your sedentary occupation and the medical infromation did not support your inability to perform sedentary work." (LINA KD 928). There was no meaningful discussion of the opinions of Drs. Ozenne or Nwofia, or of the observations of Ms. Dorris's physical therapist. CIGNA's continued reliance on the misrepresentation or manipulation of Dr. Acosta's PAA is similarly reflected in CIGNA's internal correspondence, where CIGNA employees note that their reason for denial is their belief that "her doctor gave limitations that would allow her to work at even higher level." (LINA KD 15).

Drs. Acosta, Ozenne, and others specifically examined the functional impact of Ms. Dorris's condition and concluded that it had rendered her totally disabled. (LINA KD 149, 593, 577-78). The court cannot agree with CIGNA's selective and disingenous reading of Dr. Acosta's PAA. See Kalish v. Liberty Mutual/Liberty Life Assurance Co. of Boston, 419 F.3d 501, 506-07 (6th Cir. 2005)(treating physician's observation that claimant might be able to engage in "sedentary work" cannot be a rational basis to deny benefits where physician's other findings make clear that claimant cannot meet requirements of actual occupation); Brooking v. Hartford Life & Accident Ins. Co., 167 Fed. Appx. 544, 548-49 (6th Cir. 2006)(where there is uncontradicted evidence that the claimant is unable to sit for more than four hours a day, and where potential jobs in question required sitting for "most of the day," plan administrator did not act rationally when it denied benefits based on its

conclusion that claimant should be able to perform "sedentary" work). In the court's view, the report provides unambiguous, uncontroverted evidence that Ms. Dorris could not perform two of the duties specifically identified and required by her employer. Further, the opinions of other physicians who have examined Ms. Dorris support the limitations identified by Dr. Acosta. Under the Policy language CIGNA says now governs, Ms. Dorris is totally disabled because she cannot perform all of the duties of her job. Therefore, regardless of which standard of review applies, CIGNA's decisions to deny benefits should be overturned.

**Dr. Kenneth Graulich's File Review Does Not Justify CIGNA's Denial**

The only medical opinion that CIGNA relied upon during the claims process was that of a file reviewer, Dr. Kenneth Graulich. (LINA KD 552-57). He was only hired by CIGNA after it had already sent four denial letters to Ms. Dorris. (LINA KD 227-30, 150-51, 147, 114-15). The only specific "basis" cited by Dr. Graulich for his conclusion that Ms. Dorris's condition "would not, in [his] opinion, be a cause for inability to do sedentary work" is the fact that he believed "fibromyalgia is a controversial diagnosis" and "all the symptoms and signs are self-reported in nature." (LINA KD 556-57). Yet, in the very same report, Dr. Graulich concurs that Ms. Dorris suffers from fibromyalgia. (LINA KD 562).

On remand from this court to consider the SSA award, years after the earlier denials, CIGNA's internal medical director, Dr. Paul Seiferth, drafted a supplemental opinion. (LINA 1869-71). Like Dr. Graulich, he did not personally examine Ms. Dorris. His opinion was based on a review of her file and an assessment of her condition and impairments as they existed over the prior

27

four years.[6]   The failure to conduct a physical examination may "raise questions about the thoroughness and accuracy of the benefits determination." <u>Calvert</u>, 409 F.3d at 295.   Although "reliance on a file review, does not, standing alone, require the conclusion that [a plan administrator] acted improperly," <u>Kalish v. Liberty Mutual</u>, 419 F.3d 501, 508 (6th Cir. 2005), it is yet another factor to be considered in the overall assessment of the decision-making process. <u>Id.</u> ("Whether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician.").

Both Dr. Acosta and Dr. Ozenne have personally treated and repeatedly observed Ms. Dorris over the entire course of her dispute with CIGNA.   Both have consistently opined that, because of her fibromyalgia and limitations resulting therefrom, Ms. Dorris is totally disabled.   Dr. Nwofia, who also personally evaluated Ms. Dorris, and Ms. Dorris's physical therapist concurred.   Drs. Graulich and Seifert, who have never examined or even met Ms. Dorris, disagreed.   While it is true that a plan administrator is not required to accord special deference to the opinion of treating physicians, it may not arbitrarily repudiate or refuse to consider the opinions of treating physicians. <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 834 (2003).   The fact that Drs. Acosta and Ozenne  physically examined and personally interviewed Ms. Dorris on numerous occasions over

_____

[6]In addition, Dr. Seiferth's file review may not have been thorough.  For example, Dr. Seifeth stated: "There is indication by the attending physicians the patient has good and bad days without any predilection to predetermination or frequency consistency or periodicity consistency of the good and bad days."  (LINA KD 1871).  In fact, Dr. Acosta stated:  "Her abilities do fluctuate: she may be practically bed- or chair-bound for 2-3 days at a time, and there may be relatively 'good days,' <u>but there is no time when she recovers enough to do even a half day's work of full activity</u>."  (LINA KD 149)(emphasis added).

28

a period of years, while Drs. Graulich and Seifert relied exclusively on a file review makes it extremely important for them to explain why their medical opinions differ from those of the examining physicians. Yet, no meaningful explanation is provided. See Kalish, 419 F.3d at 509 (explaining that the file review performed at defendant's request was inadequate for many reasons, including that the file reviewer did not explain satisfactorily why he disagreed with the opinions of plaintiff's treating physicians); Calvert, 409 F.3d at 295 (concluding that the plan administrator's reliance on a "'pure paper' review" was "just one more factor" that supported the court's ruling that a denial of benefits was arbitrary and capricious); see also McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 170 (6th Cir. 2003)("The evidence presented in the administrative record did not support the denial of benefits when only [the administrator]'s physicians, who had not examined [the claimant], disagreed with the treating physicians."). Considering all of this, their opinions do not outweigh the opinions of Ms. Dorris's treating physicians and physical therapist. See Railey v. Cooperative Benefit Admins., Inc., 2006 WL 1548968, at *7 (W.D. Ky. June 5, 2006)(finding a file review inadequate where defendant's physicians failed to personally examine plaintiff and failed to relate their diagnoses to the plaintiff's job descriptions).

**CIGNA's Reliance on the "Sedentary" Classification of Ms. Dorris's Job is Contrary to Policy Language**

In initially denying her benefits and again in denying her appeals, CIGNA relied on the "sedentary" classification of Ms. Dorris's position and cited to the U.S. Department of Labor Dictionary of Titles ("DOT"). Although the work of a customer service representative may be considered a physically "sedentary" occupation, Ms. Dorris's LTD Plan does not mention the DOT classifications. The Plan provides that an insured is considered disabled when "you are unable during the first two (2) years . . . of a period of disability to do all duties pertaining to your

29

employment." (LINA KD 895, 1823). The court's focus is not on the sedentary classification of Ms. Dorris's former position by the DOT, but on applying the language of the Policy to the specific requirements of Ms. Dorris's former position.

**The Social Security Administration's Finding of Total Disability Is Relevant**

A disability determination by the SSA is relevant in an action reviewing a plan administrator's decision to deny or terminate benefits under an ERISA plan. <u>Glenn</u>, 2006 WL 2519293, at **6-7. While the SSA's decision to award benefits to a claimant does not, standing alone, require the reversal of a decision to deny benefits, <u>Calvert</u>, 409 F.3d at 294-95, it is "a significant" factor the court considers, in the context of the record as a whole. <u>Glenn</u>, 2006 WL 2519293, at **7-8 ("Having benefitted financially from the government's determination that [the claimant] was totally disabled, MetLife obviously should have given appropriate weight to that determination."). In the same way, CIGNA's failure to consider the favorable ruling by the SSA, despite initially requiring Ms. Dorris to seek the opinion and specifying a law firm to represent her, is a significant factor this court considers. <u>See</u> <u>Glenn</u>, at *8.

Here, the SSA found "[t]he record is well documented concerning symptoms and limitations of function with regard to fibromyalgia as diagnosed by numerous qualified medical sources, including Dr. Acosta, Dr. Ozene [sic], Dr. Wolfe, Dr. Nwofia, and Dr. John." (LINA KD 0062). The SSA further found that Ms. Dorris was disabled as a result of fibromyalgia and a depressive disorder. The SSA considered Ms. Dorris's subjective allegations to be "credible in light of her testimony and demeanor at the hearing and . . . consistent with the objective evidence and other evidence as a whole." (LINA KD 62). In addition, it viewed her testimony as "credible especially in view of her extensive work history." (<u>Id.</u>) These findings are relevant, especially considering

30

CIGNA's repeated assertion that Ms. Dorris lacked objective evidence of her functional limitations and that her only symptoms were "self-reported" and therefore not credible. No physician reviewing her case on behalf of CIGNA ever even met Ms. Dorris, let alone spoke with her about her condition so as to be able to make some judgment about her credibility in claiming what CIGNA described as exclusively self-reported symptoms.

In addition, the SSA concluded that: "With a residual functional capacity to perform less than a full range of basic work activities on a regular and continuing basis at any exertional level (i.e., eight hours a day for five days a week or an equivalent work schedule), the occupational base is so severely eroded that there are no other jobs existing in significant numbers in the national economy that the claimant can perform." The SSA also found that Ms. Dorris "is unable to apply any acquired vocational skills to other work because of the severity of her symptoms." These findings are relevant to the court's evaluation of whether Ms. Dorris is disabled under the "any occupation" provision of the Policy, and have not been commented on by defendants.

**Ms. Dorris Complied with CIGNA's Requests for Additional Evidence**

The defendants imply that Ms. Dorris did not fully comply with CIGNA's requests for specific, additional evidence. (Docket No. 75 at 19-21). After the defendants' denial, CIGNA asked Ms. Dorris to include the following documentation if she chose to appeal: (1) a personal letter explaining why she could not perform her job; (2) a copy of an independent medical examination report from the past year; and (3) a complete copy of the medical record from her treating physicians from November 2001 to the present. (LINA KD 1145). Mrs. Dorris provided the requested medical records, including records of medical examinations from the six doctors who agreed on the diagnosis of fibromyalgia. Her file included the PAA from Dr. Acosta paired with the Job Requirements Form

31

from Cummins (both of which were requested by CIGNA) as well as multiple clinical evaluations documenting the extent of her disability. (LINA KD 247-251, 149, 577-78).   She also supplied the requested personal letter explaining why her condition had rendered her unable to work. (LINA KD 211-12).  She sought CIGNA's guidance as to any additional documentation that CIGNA might deem necessary, including a Functional Capacity Evaluation. (LINA 574).  CIGNA responded that it would notify her if additional information was needed (LINA KD 567) and then declined her claim for a fourth time, stating "we have no medical evidence to support that your condition is severe enough to prevent you from sedentary work." (LINA KD 928).  In the interim, CIGNA's team leader had actually instructed her staff not to request any functionality evaluations. (LINA KD 109).

**CIGNA's Refusal to Consider Ms. Dorris's "Subjective" Evidence Is Not Supported by the Policy Language**

It is CIGNA's position that, regardless of Ms. Dorris's condition or conditions, it is entitled to deny her claim because there is no "clinical" or "objective" evidence to demonstrate that she is unable to perform all of the duties of her job.  (LINA KD 229, 1867).

By requiring Ms. Dorris to provide objective evidence in support of her complaints of chronic disabling impairments, CIGNA is asking Ms. Dorris to meet an additional requirement for eligibility beyond those imposed by the Policy.   Ms. Dorris's Policy does not restrict the type of evidence or "proof" that may be used to show total disability.  Glenn, 2006 WL 2519293, at *11.  Nor does it say that self-reported or "subjective" factors should be accorded less significance than other indicators.  Id. (finding that it was unreasonable for plan to refuse to consider the effect of plaintiff's "stress," when the plan did not say that self-reported or subjective factors should be accorded less significance than other indicators); see also Green v. Prudential Ins. Co., 383 F. Supp.2d 980, 997-98 (M.D. Tenn. 2005)(Nixon, J.)(where treating physicians and specialists have

32

diagnosed fibromyalgia, and there not objective tests available to prove certain symptoms, it is

unreasonable to require objective findings); <u>Pollini v. Raytheon Dis. Employee Trust</u>, 54 F. Supp.2d

54, 59 (D. Mass. 1999)("the claim administrator's rejection of a claim solely on the basis of a

purported lack of objective evidence is troubling and questionable."); <u>May v. Metropolitan Life Ins.

Co.</u>, 2004 WL 2011460, *7 (N.D. Cal. Sept. 9, 2004)(holding that "MetLife abused its discretion

by requiring the Plaintiff meet an additional requirement for eligibility beyond those imposed by the

plan. The administrator cannot exclude a claim for lack of objective medical evidence unless the

objective

medical evidence standard was made clear, plain and conspicuous enough in the policy to negate

Plaintiff's objectively reasonable expectations of coverage . . . .").

      Moreover, as the Seventh Circuit explained:

> [F]ibromyalgia, also known as fibrositis [is] a common, but elusive
> and mysterious, disease, much like chronic fatigue syndrome, with
> which it shares a number of features. Its cause or causes are
> unknown, there is no cure, and, of greatest importance to disability
> law, its symptoms are entirely subjective. There are no laboratory
> tests for the presence or severity of fibromyalgia. The principal
> symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and--
> the only symptom that discriminates between it and other diseases of
> a rheumatic character--multiple tender spots, more precisely 18 fixed
> locations on the body (and the rule of thumb is that the patient must
> have at least 11 of them to be diagnosed as having fibromyalgia) that
> when pressed firmly cause the patient to flinch . . . . There is no
> serious doubt that [the claimant] is afflicted with the disease but it is
> difficult to determine the severity of her condition because of the
>
> unavailability of objective clinical tests . . . .

<u>Hawkins v. First Union Corp. Long-Term Dis. Plan</u>, 326 F.3d 914, 916 (7th Cir. 2003).

      Finally, there is "clinical" and "objective" evidence in the record. CIGNA was happy to treat

33

Dr. Acosta's PAA as such when CIGNA utilized it as an objective basis for its denials of benefits. CIGNA's PAA form specifically asked Dr. Acosta to base his responses on his "clinical evaluation." (LINA KD 247). Ms. Dorris's treating physicians applied the medically accepted American College of Rheumatology ("ACR") 18 "trigger/tender point" criteria in diagnosing her fibromyalgia. (LINA KD 117, 128, 119, 329). Application of ACR criteria has been recognized by the courts as "objective" evidence with regard to fibromyalgia pain for purposes of establishing long term disability. See Chronister v. Baptist Health, 442 F.3d 648, 656 (8th Cir. 2006)(citing Hawkins, 326 F.3d at 919). Additionally, lab tests showed that Ms. Dorris contracted Epstein Bar and cytomegalovirus infections which Dr. Ozenne noted are linked to fibromyalgia and chronic fatigue syndrome. (LINA KD 557). Ms. Dorris's physical therapist noted that she was unable to perform functions consistent with sedentary work. (LINA KD 579). In addition, "[t]he SSA determination, at a minimum, provides support for the conclusion that an administrative agency charged with examining [Ms. Dorris's] medical records found, as it expressly said it did, objective support for [her treating physicians'] opinion[s] in those records." Calvert, 409 F.3d at 924.

**A Change in Ms. Dorris's Condition Is Unnecessary**

In addition, CIGNA argues that there is no evidence showing that there was a change in Ms. Dorris's condition between the time she was attempting to work and the time she was forced to cease work. (LINA KD 151, 0563-64, 0658). The Seventh Circuit answered this argument in Hawkins:

> [The Plan] would be correct if there was a logical incompatibility between working full time and being disabled from working full time, but there is not. A desperate person might force himself to work despite an illness that everyone agreed was totally disabling. Yet even a desperate person might not be able to maintain the necessary level of effort indefinitely. Hawkins may have forced himself to continue in his job for years despite severe pain and fatigue and finally found it too much and given it up even though his condition

34

> had not worsened. A disabled person should not be punished for
> heroic efforts to work by being held to have forfeited his entitlement
> to disability benefits should he stop working.

Id. at 918; see also Wilson v. The John C. Lincoln Health Network Group Dis. Income Plan, 2006

WL 798703, at *8 (D. Ariz. 2006)(demanding evidence of a change in condition as of the day a

claimant ceases work demonstrates arbitrariness in that it assumes one never works while disabled).

The same reasoning applies to Ms. Dorris. CIGNA may not penalize Ms. Dorris for her attempts

to work while her condition deteriorated. (LINA KD 151).

III.    **CONCLUSION**

    Throughout the claims process, CIGNA has not acted fairly concerning the applicable plan

document governing Ms. Dorris's claim, the standard of disability on which it was purportedly

basing its denials, and even who was administering her claim. It is arguable whether Ms. Dorris

could have ever adequately met CIGNA's burden, given the fact that CIGNA has repeatedly given

her different accounts of that burden.

    At last, CIGNA has finally stipulated as to the Policy governing Ms. Dorris's LTD claim and

the identity of the claims administrator. Under that Policy, in order to be "totally disabled" during

the first two years of her disability, Ms. Dorris must prove that she is unable to perform "all duties"

pertaining to her employment. Ms. Dorris has been diagnosed with fibromyalgia by multiple

physicians, even CIGNA's own Dr. Graulich, based upon the objective, 18-point American College

of Rheumatology testing criteria. These findings are consistent with Ms. Dorris's symptoms

reported to her doctors and to CIGNA. The doctors who have personally examined Ms. Dorris state

that she is "totally disabled from her job or any office job and from the usual activities of living,"

"totally incapacitated and unable to work," and "functionally unable to do much more than self-

care." Neither the credibility of these physicians, nor that of Ms. Dorris, has seriously been questioned by CIGNA. The SSA, in awarding Ms. Dorris SSDI benefits, found Ms. Dorris to be a credible witness in view of her demeanor at the hearing and her extensive work history. It also found her testimony regarding her subjective allegations consistent with "objective evidence and the other evidence as a whole."

CIGNA was not entitled to discredit Ms. Dorris's claims based on abstract terms such as "sedentary" without taking into account the specific demands of her job and amount of time each day she could perform this type of work. Demands such as continuous sitting and frequent reaching at desk level are demands that Dr. Acosta specifically said Ms. Dorris was unable to meet, but which are required of her former position at Cummins.

Both of CIGNA's file review doctors, who had never spoken to or examined plaintiff in person, opined that she has not shown that she had functional limitations to performing her job. They did not address Dr. Acosta's clear statement that Ms. Dorris could not sit continuously and reach frequently as is required of her former position. Neither of them contacted Ms. Dorris directly to assess her functional limitations, her credibility, or status.

CIGNA has refused to consider significance evidence, both objective and subjective, documenting Ms. Dorris's diagnoses, symptoms, and functional limitations, even though the Plan language does not define or limit the types of proof a claimant can submit to prove total disability. It acted under a financial conflict of interest and in conflict with the determination of disability by the SSA. Considering all of the above, the court cannot agree with CIGNA's decision to deny LTD benefits to Ms. Dorris.

The court finds that the evidence in the administrative record establishes that, due to her

36

fibromyalgia and resulting functional limitations, Ms. Dorris cannot perform all of the duties of her former position at Cummins as a customer service representative on a full-time basis. Therefore, plaintiff is totally disabled under the terms of the Policy and is entitled to a judgment awarding all LTD benefits due to her, applying either a de novo or arbitrary and capricious standard of review. The court therefore reverses the judgment of CIGNA and orders CIGNA to award Ms. Dorris all past-due LTD benefits.

The defendants contend that the court should remand this matter to CIGNA for another review in the event that the court reverses their denials. (Docket No. 75 at 22). They claim that they have not yet determined whether Ms. Dorris is unable to perform "any work" for which she is reasonably fitted (the definition applying to disabilities lasting over two years), but only whether she was unable to do "all duties pertaining to her employment" at Cummins. (Id.) According to defendants, the court only has jurisdiction to award Ms. Dorris two years of benefits because allowing anything further would be to "review a decision that was never made."

The defendants issued their most recent denial of Ms. Dorris's claim for LTD benefits on May 31, 2006 – over four and one-half years after Ms. Dorris ceased working and well after the close of the two year "own occupation" window. (LINA KD 1866-68). Defendants should have known at that time that they needed to evaluate her claim under both the "own occupation" and "any occupation" provisions. Given the defendants' conduct to date, the court is unpersuaded that CIGNA/CGLIC should be given another opportunity to retroactively re-consider Ms. Dorris's ongoing disability status as it existed over the past three years. The defendants have already received the benefit of one remand to reevaluate Ms. Dorris's claim, and it took them over six months to issue a ruling – surpassing by several months the time period allowed by law to review

37

an entire ERISA appeal, much less a single seven-page SSDI document. See C.F.R. § 2560.503-1. Moreover, the ruling came only after Ms. Dorris filed a motion to reinstate this action with this court. Further remands are not appropriate under these circumstances. Cf. Williams v. Int'l Paper Co., 227 F.3d 706, 715-16 (6th Cir. 2000)(holding that plan administrator acted arbitrarily and capriciously when it failed to consider additional medical evidence submitted by plaintiff and that it was appropriate for the court to retroactively grant disability benefits without remanding the case where there are no factual determinations to be made and a remand would be futile).

There is sufficient uncontroverted evidence in the administrative record establishing that Ms. Dorris is unable to perform any work for which she is reasonably fitted by learning or experience. The doctors who have personally examined Ms. Dorris state that, due to her conditions and resulting symptoms and impairments, she is "totally disabled from her job or any office job and from the usual activities of living," "totally incapacitated and unable to work," and "functionally unable to do much more than self-care." The SSA concluded that: "With a residual functional capacity to perform less than a full range of basic work activities on a regular and continuing basis at any exertional level (i.e., eight hours a day for five days a week or an equivalent work schedule), the occupational base is so severely eroded that there are no other jobs existing in significant numbers in the national economy that the claimant can perform." Dr. Acosta stated that she was not a suitable candidate for vocational rehabilitation. The SSA also found that Ms. Dorris "is unable to apply any acquired vocational skills to other work because of the severity of her symptoms." Of course, Ms. Dorris's benefits will only continue for so long as she continues to submit proof that she remains totally disabled in accordance with the Policy language. (LINA KD 1823-24).

Ms. Dorris seeks an award of attorney's fees and costs. In any action governed by 29 U.S.C.

§ 1132(g)(1), the court in its discretion may allow reasonable attorney's fees and costs to any party. The court exercises its discretion based on the following factors: (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions. <u>Moon v. Unum Provident Corp.</u>, 461 F.3d 639, 643 (6th Cir. 2006)(citing <u>Sec'y of Dep't of Labor v. King</u>, 775 F.2d 666, 669-70 (6th Cir. 1985)). No single factor is determinative. <u>Moon</u>, 461 F.3d at 643-44. Upon reviewing the record, the court finds that the majority of these factors weigh in Ms. Dorris's favor. While it is true that the court's decision in this case does not confer a common benefit on the participants or beneficiaries of the LTD plan, the defendants' conduct as described above, spanning a period of years, strongly justifies an award of fees and costs in Ms. Dorris's favor.

For the reasons set forth above, plaintiff Karen Dorris's motion for judgment on the administrative record (Docket No. 77) will be GRANTED, and defendants' motion for judgment on the administrative record (Docket No. 74) will be DENIED. The decision to deny Ms. Dorris's claim for LTD benefits will be REVERSED. Defendants will be ORDERED to pay Ms. Dorris all past-due LTD benefits, health benefits, and other employee benefits available to her, and reinstate

all of her future and ongoing benefits. Ms. Dorris is also entitled to an award of attorney's fees and costs.

An appropriate order will enter.

39

ALETA A. TRAUGER
United States District Judge